[Nos. G006558, G008374. Fourth Dist., Div. Three. Dec. 21, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWTIS DONALD RHODEN, Defendant and Appellant.

In re LAWTIS DONALD RHODEN, on Habeas Corpus.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rule 976(b), parts II-X are not published, as they do not meet the standards for publication.

1246

**COUNSEL**

Stephen S. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Pat Zaharopoulos and Gil P. Gonzales, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SONENSHINE, J.**—A jury convicted Lawtis Donald Rhoden of rape (Pen. Code, § 261, subd. (2)),[1] forceful sexual penetration (§ 289, subd. (a)), and sexual battery (§ 243.4); an allegation he had suffered a prior serious felony conviction within the meaning of sections 667 and 1192.7, subdivision (c) was found true. He appeals, citing numerous errors.

On June 2, 1984, 17-year-old Christine S. was walking home on Orange Avenue, returning from a babysitting job. Rhoden and a female passenger

---

[1] All statutory references are to the Penal Code unless otherwise specified.

pulled up next to her in his car and began talking to her. He told Christine he was a photographer and asked her if she would be interested in modeling lingerie for money. Although she felt uncomfortable about it, she agreed.

Rhoden told her to get into the car and they would go to a park a couple of blocks away where he would take some pictures of her. The female passenger slid to the center of the front seat and Christine got in. When they had passed the park, she asked where they were going. The passenger responded, "I guess you'll see." At this point Christine "knew that something was going on," but there was too much traffic to get out of the car.

They stopped at an apartment complex, where the passenger got out and stood away, facing the street. Rhoden proceeded to a carport about 20 or 30 feet away and parked. At this point Rhoden began undressing her, telling her he did this to all his girls. He removed her blouse and bra and fondled and kissed her breasts. She told him to stop.

He then removed the rest of her clothing, took off his own pants and began to masturbate. Placing one of Christine's legs on the top of the car seat, he inserted his finger in her vagina. He then inserted his penis into her vagina and proceeded to have intercourse with her, saying, "Don't be nervous. I don't want to hurt you." Christine asked him to please stop two or three times and started crying, trying to push him off twice. He said, "Just let me finish, I've got to get this over and split."

Rhoden was finished after "a couple of minutes," and he told her to get dressed. After she dressed, the passenger got back into the car and she was taken to the spot where she had been picked up. Rhoden gave her a $20 bill. When she asked what it was for, he said it was "for what she had done." He asked if he could meet her the next day. He refused to give her his telephone number, but she gave him hers so an arrest could be set up. As he left she memorized the license plate number.

Christine ran home and called her best friend, Shelly, who convinced her she should "do something." Shelly and Shelly's parents went to Christine's house and the police were called soon after.

At trial, testimony was presented by two young women who, in the same two-month period, had been accosted by Rhoden in similar incidents and raped.

I

By the time the investigation of the case was completed, Rhoden was in Tennessee facing other charges. Rhoden argues section 1389, the Interstate

Agreement on Detainers Act (IAD), was violated when he was not returned to California from Tennessee for trial within the 180 days specified by article III of the statute; further, once returned his trial did not commence within the 120 days allotted in article IV. Relying on article III, subdivision (d) and article IV, subdivision (e), he maintains the remedy for these violations is dismissal with prejudice.

Section 1389 codifies an agreement between California, 47 other states, and the federal government. It facilitates the resolution of detainers, based on untried indictments, informations or complaints in one jurisdiction, lodged against persons who have "entered upon a term of imprisonment" in another jurisdiction. (*People* v. *Brooks* (1987) 189 Cal.App.3d 866, 871-872 [234 Cal.Rptr. 573].)

Pursuant to article III of section 1389, a prisoner against whom a detainer has been lodged may submit a written request to the state in which charges are pending (the "receiving state") for final disposition of the charges. The request must be sent via the warden of the institution in which the prisoner is serving a term of imprisonment (the "sending state"). (§ 1389, art. III, subd. (a).) Failure of the receiving state to commence the trial of the inmate within 180 days after the request is submitted shall result in dismissal of the charges with prejudice. (§ 1389, art. V, subd. (c).)

Article IV provides the means by which a prosecutor who has lodged a detainer against a prisoner in another state can secure the prisoner's presence for trial. A trial must then be commenced within 120 days of the arrival of the prisoner in the receiving state. (§ 1389, art. IV, subd. (c).)

The following scenario is presented here:

On October 17, 1985, the Orange County District Attorney sent a letter to Tennessee authorities notifying them Rhoden had charges pending in California. The district attorney indicated he would be proceeding by way of extradition to secure Rhoden for trial upon the conclusion of his case in Tennessee.

On November 22, Rhoden was sentenced to prison in Tennessee. Two Orange County detectives were present to take custody of him under an executive agreement to face the pending charges in California. However, Rhoden had filed a motion for new trial which, in Tennessee, is heard after sentencing. He also had filed two writs which had not yet been determined. Because he still had matters pending, the Tennessee trial court refused to honor the executive agreement.

On December 2, the Orange County District Attorney received a letter from Rhoden demanding trial. Although required by section 1389, the letter did not conform to the statute because it was neither sent through the warden's office nor was it accompanied by the warden's certificate.

On December 13, the Orange County District Attorney lodged a detainer referring to unrelated pending grand theft charges. On February 11, 1986, a detainer was lodged relating to the instant offense. Rhoden arrived in California on August 15.

*A.   The Section 1389, Article III Claim.*

Turning to Rhoden's article III objection, he contends a violation occurred when he was not brought to trial within the allowable time frame. Under this article, a person who has "entered upon a term of imprisonment" must be "brought to trial within one hundred eighty days after he [or she] shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his [or her] imprisonment and his [or her] request for a final disposition . . . ." (§ 1389, article III, subd. (a).)

Rhoden first claims he had "entered upon a term of imprisonment," as required in article III, when he was sentenced to prison in Tennessee on November 22, 1985. ██   Although article III makes no distinction between prisoners on the basis of pending litigation, the "term of imprisonment" under the statute cannot begin until all the prisoner's legal matters in the foreign jurisdiction are complete, because only then is he or she truly available to the "receiving state." (See *United States* v. *Mauro* (1978) 436 U.S. 340, 362 [56 L.Ed.2d 329, 348, 98 S.Ct. 1834].)

Here, for example, Rhoden was not available when California tried to extradite him, because Tennessee refused to release him until the motion for new trial had been heard. (It was heard on June 27, 1986.) Since it was still possible for him to be granted a new trial, he was not finished with his criminal case in that state. Of course, there is a distinction to be made between pending trial court matters and appellate court matters. Where matters are pending in the trial court, a felony defendant is ordinarily required to be present. Such is not the case with appeals or writs. Were we to construe it otherwise, a tension would exist between the prisoner's right to appeal and his right to a speedy trial elsewhere.

For purposes of the IAD, a "term of imprisonment" does not begin until all matters are concluded in the trial court, before and after pronouncement of sentence. The new trial motion prevented the district attorney's access to

Rhoden because his presence was required in Tennessee. The IAD was not intended to cause friction between states, each asserting a right to a prisoner. Its purpose was "to encourage the expeditious and orderly disposition" of charges and establishing "cooperative procedures" for their treatment. (§ 1389.) Rhoden's "term of imprisonment" for article III purposes could not have begun earlier than June 27, 1986, the day his motion for new trial was denied.

Rhoden next argues, because the October 17, 1985, letter from the Orange County District Attorney contained all the necessary elements, it constituted a de facto "detainer." He further argues his December 2 letter to the Orange County District Attorney "triggered" the 180-day period during which he had to be tried under article III.

■ " '[A] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he [or she] is wanted to face pending criminal charges in another jurisdiction.' [Citations.]" (*United States* v. *Mauro, supra,* 436 U.S. at p. 359 [56 L.Ed.2d at p. 346].) ■ The IAD was drafted to remedy problems with inactive detainers, which would often be filed by foreign jurisdictions and allowed to lie dormant until the prisoner had completed the sentence in another state. (*People* v. *Brooks, supra,* 189 Cal.App.3d at p. 872.) Where no detainer has been filed, the intent of the IAD is not in danger of being frustrated. Therefore, "a formal detainer must be filed before an inmate . . . may invoke the provisions of the IAD." (*Id.,* at p. 874.)

The letter sent on October 17 contained the elements of a detainer; i.e., it notified Tennessee that Rhoden was wanted in California to face pending charges. We would be tempted to find this letter was a detainer but for its language explicitly stating the district attorney was proceeding by way of an extradition request to the Governor. Moreover, the letter also stated the district attorney had decided *not* to file a detainer at that time.[2] "The lodging of a detainer or presenting a request is discretionary with the district attorney." (*People* v. *Castoe* (1978) 86 Cal.App.3d 484, 490 [150 Cal.Rptr. 237].)

In *United States* v. *Mauro, supra,* 436 U.S. 340, the Supreme Court held writs of habeas corpus ad prosequendum were not detainers for IAD purposes because they were immediately executed, thus avoiding the "adverse effects of detainers that prompted the drafting and enactment of the Agreement [which are] for the most part the consequence of the lengthy

---

[2] We observe the district attorney proceeded, true to his word, to obtain an executive agreement, which was later aborted when the Tennessee trial court refused to honor it.

duration of detainers." (*Id.*, at p. 360 [56 L.Ed.2d at p. 347].) Similarly, an extradition procedure has none of the features which the IAD was designed to remedy. It is an expeditious manner of obtaining a prisoner without the disadvantages to the prisoner of a long-dormant detainer, e.g., frustration of rehabilitation efforts, denial of privileges within the prison, etc. (*Ibid.*)

In the face of the letter's clear statement of purpose and in light of the intent of the IAD, we find this letter was not a detainer.

In view of that finding, Rhoden's next contention is quickly resolved. His letter of December 2 did not activate the article III time limit: At that point no detainer had been filed. Even if one had been filed, Rhoden's letter would be inadequate to constitute an article III demand in that "appellant has not substantially complied with its procedural requirements. Article III, subdivision (a) provides that the 180-day period is to run from the date the prisoner 'shall have caused to be delivered' a written notice and request for final disposition to the district attorney and the court. Article III, subdivision (b) clearly states that the prisoner shall give or send the notice and request *to the warden, commissioner of corrections or other official having custody of the prisoner*." (*People* v. *Castoe, supra,* 86 Cal.App.3d 484, 490.)

The warden then prepares a certificate "stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner." (§ 1389, art. III, subd. (a).)

Rhoden's letter was sent directly to the district attorney, instead of the warden, and contained none of the information required in a certificate except the term of commitment. Without the accompanying certification from the warden, the district attorney had no duty to act upon the letter and no article III clock was activated. (*Ibid.*) Compliance with this procedural requirement is the only way the People can be placed on notice they must bring the prisoner to trial within 180 days.[3]

Although a proper detainer was later lodged, Rhoden never complied with the requirement that he submit his request to the warden. Finally, as

---

[3] Evidence was presented in the trial court that status certification forms were received by the district attorney on February 10, 1986. The trial court ruled these were of no legal force and effect because Rhoden had refused to sign them. This was correct; under article III, subdivision (e), the prisoner's signature constitutes a waiver of extradition and so is a vital component of this process.

we indicated above, Rhoden's "term of imprisonment" did not begin, for purposes of activating the time limit, until June 27, 1986, the day his motion for new trial was heard. Therefore, we hold there was no article III violation.

██ We are mindful of article IX, which states the agreement "shall be liberally construed so as to effectuate its purposes." However, we view those purposes to be the orderly and expeditious disposition of charges pending in foreign jurisdictions and the establishment of cooperative procedures to facilitate such disposition. (*People* v. *Cella* (1981) 114 Cal.App.3d 905, 916 [170 Cal.Rptr. 915].) Its purposes are not served by allowing substantial circumvention of those procedures.

To summarize, Rhoden's term of imprisonment under section 1389 did not begin until June 27, 1986. The district attorney's letter of October 17, 1985, was, by its own language, not a detainer. Even if we were to view it as one, Rhoden failed to activate article III by presenting his demand to the warden of the Tennessee prison, who would have been required to forward it, along with the certification, to the district attorney in Orange County. Therefore, the 180-day period of article III never commenced.

*B. The Section 1389, Article IV claim.*

Rhoden contends article IV of section 1389 was violated because he was not brought to trial within 120 days of his return to California on August 15, 1986. He asserts the 120 days lapsed on December 16, 1986. By the time his motion to dismiss was denied, on August 13, 1987, he had not yet been brought to trial.

██ We need not reach Rhoden's asserted article IV violation because he waived his right to contest it in the lower court on two separate occasions. On June 24, 1987, Rhoden and his counsel engaged in the following exchange: "MR. PETERS: Now, obviously, you've reserved the right to contest Article 3; is that correct? [¶] THE DEFENDANT: Yes. [¶] MR. PETERS: And we waived our right to contest any challenge of the 120 days? [¶] THE DEFENDANT: That's correct." On that same day Mr. Peters made the following representation to the court: "Mr. Rhoden reserved his right at some point to challenge the interstate detainer while conceding that if there is a valid Article 4 request that there is no violation of Article 4 requirements."

On August 3, 1987, a similar colloquy took place: "THE COURT: We are now on Article 4 analysis. [¶] MR. PRICKETT: He's waived Article 4. This is only an Article 3 motion. [¶] MR. PETERS: Right."

It is clear Rhoden, with the concurrence of counsel, personally and intentionally waived any article IV objection in open court. (Cf. *People* v. *Brooks, supra*, 189 Cal.App.3d at p. 871.)

Furthermore, Rhoden's written motion to dismiss pursuant to section 1389, signed by counsel and by Rhoden, is devoid of any reference to article IV. The lower court never ruled on an article IV claim.

There is no authority for Rhoden's assertion such an objection is jurisdictional, and therefore cannot be waived. In fact, existing authority is to the contrary. (*U.S.* v. *Eaddy* (6th Cir. 1979) 595 F.2d 341, 344.) An article IV claim cannot be raised for the first time on appeal. (*Id.*, at p. 346; *People* v. *Zetsche* (1987) 188 Cal.App.3d 917, 925 [233 Cal.Rptr. 720].)

Moreover, Rhoden suggests that if there was a waiver, it constituted ineffective assistance of counsel *per se*. ▮▮▮▮ ▮▮▮▮ (*People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)[4] ▮▮ In *People* v. *Johnson* (1989) 47 Cal.3d 1194 [255 Cal.Rptr. 569, 767 P.2d 1047], our Supreme Court summarized the applicable standard for review: "When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, unless counsel was asked for an explanation and failed to provide one or unless there could be no satisfactory explanation, the case is to be affirmed on appeal. [Citation.]" (*Id.*, at p. 1251.)

▮▮ In this case, the waiver of the article IV issue is not, as Rhoden claims, ineffective assistance *per se*. First, Rhoden would have us assume from a silent record the article IV waiver was given *as a result of* erroneous

---

[4] We note Rhoden, at his request, had been granted permission to act as cocounsel with attorney Peters for the purpose of this motion. Rhoden's name and address, along with Peters's, appears on the front page of the pleadings and they were signed by both. The parties stipulated such an order was made by Judge O'Leary, based on Rhoden's assertion his unique knowledge of the circumstances of this motion placed him in the best position to present it.

Ordinarily, a defendant is not permitted to be represented by an attorney and also participate actively in his or her own defense. (*People* v. *Mattson* (1959) 51 Cal.2d 777, 797 [336 P.2d 937].) However, a defendant may be allowed to do so if a "substantial showing determines that in the circumstances of the case the cause of justice will thereby be served . . . ." (*Ibid.*) A defendant who acts as his or her own attorney, even as cocounsel, waives the Sixth Amendment right to be represented by counsel. (*People* v. *Spencer* (1984) 153 Cal.App.3d 931, 940 [200 Cal.Rptr. 693].) However, the defendant must be made aware he or she is doing so and the waiver must appear on the record. Specifically, for our purposes, the defendant must be informed of the inability to claim ineffective assistance of counsel for the portion of the case under his or her control. (*Id.*, at p. 945.) No such advisement appears on this record. Thus, the ineffective assistance argument was not waived, and we address the issue.

advice from counsel. But under the circumstances, Rhoden could have insisted upon the waiver *in spite of* the advice of counsel.[5]

Second, the record is replete with continuances at the request of the defense. There is ample evidence in the record that continuing the trial date was in response to Rhoden's own demands.[6] Counsel may have determined it would be inconsistent to raise an article IV claim while concurrently moving for liberal continuances. This would not have been true of the article III claim, because under Rhoden's theory, it was perfected over two months before he arrived in California. An article III claim was thus not inconsistent with a request for more time to prepare for trial, whereas an article IV claim would have been.[7]

Finally, it is conceivable counsel informally agreed with the prosecution to waive an article IV objection, prior to the expiration of the 120 days, in exchange for the prosecution's lack of opposition or limp resistance to his continuance motions. This would be a legitimate and acceptable strategic maneuver to obtain more time to investigate and prepare the case. Thus, we cannot say there could be no "satisfactory explanation" for waiver of the article IV issue. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 218 [233 Cal.Rptr. 404, 729 P.2d 839].)

## II-X*

. . . . . . . . . . . . . . . . . . . . . . . . .

## XI

Rhoden was given a five-year sentence enhancement based on his prior conviction of a serious felony in Florida. (§§ 667, 1192.7, subd. (c).) He argues the imposition of the enhancement was improper because the

[5] Such an inference could be drawn from the transcript. During one proceeding Rhoden made the following admission: "[Q. BY MR. PRICKETT:] Okay. And did you discuss with both [Mr. Harley and Mr. Peters] the fact that you would be handling—you would be drafting those [Penal Code § 1389] motions and so they wouldn't have to worry about that; and so that you could—they could concentrate on other areas? [¶] [RHODEN:] Absolutely."

[6] At one point an exasperated trial court addressed Rhoden's persistent continuance motions thus: "I have to go over these [motions] extremely carefully because I realize what your [*sic*] trying to do, or at least what's in my mind is that your [*sic*] trying to get this case continued. And you'll do anything to get rid of Mr. Harley because you know that getting rid of Mr. Harley is a way to get this case continued again. And you've already had it continued, I don't know, ten, fifteen times. The record speaks for itself."

[7] Under both article III and article IV, "the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

* See footnote, *ante*, page 1242.

elements of the Florida conviction would not constitute a felony in California. This point has merit.

■■■ Under section 668, a foreign felony conviction may be used in the same manner as a California felony if the offense is punishable as a felony here. Similarly, section 667.5, subdivision (f) specifies a foreign conviction may be used to enhance a sentence if it is "for an offense which includes all of the elements of the particular felony as defined under California law . . . ."

The pertinent Florida statute provided, "[a]ny person who shall handle, fondle or make an assault upon any child under the age of 14 years in a lewd, lascivious or indecent manner, *or* who shall knowingly commit any lewd or lascivious act in the presence of such child, without intent to commit rape where such child is female, shall be deemed *guilty of a felony* . . . ." (Fla. Stat. § 800.04, italics added.)

The Florida statute can be violated in two ways, which it states in the disjunctive. The Attorney General concedes the second alternative would be merely a misdemeanor in California. The first alternative, the only potential felony, on its face lacks the mental element required for conviction under the comparable California felony statute, section 288, subdivision (a). That section provides: "Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, *with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the child,* shall be guilty of a felony . . . ." (Italics added.) The italicized portion has no counterpart in the Florida statute.

The prosecutor asked the trial court to look at the record of conviction to determine whether the substance of the acts actually committed in Florida supplied the element of specific intent required in California. In *People* v. *Guerrero* (1988) 44 Cal.3d 343 [243 Cal.Rptr. 688, 748 P.2d 1150], the court held the trier of fact may look to the entire record of conviction—but no further—to determine the substance of the prior foreign conviction. ■■ ■■■ "[B]ut when the record does not disclose any of the facts of the offense actually committed, the court will presume that the prior conviction was for the least offense punishable under the foreign law." (*Id.,* at p. 352.)[21]

---

[21] Rhoden contends the holding in *Guerrero* cannot be applied retroactively to his detriment and that his case should be decided under the mandates of *People* v. *Alfaro* (1986) 42 Cal.3d 627 [230 Cal.Rptr. 129, 724 P.2d 1154], overruled by the Supreme Court in *Guerrero.* This position is untenable in that Rhoden's offense was committed before the *Alfaro* case was

The trial court considered five documents in arriving at its decision to apply the enhancement: An advisement of rights (or *Tahl*) form, the judgment of conviction and imposition of sentence, the information, the certificate of commitment, and a Department of Corrections uniform commitment to custody form. Rhoden objected to only the last, which contained a statement by him admitting he had had intercourse with a 13-year-old girl,[22] and on appeal he maintains the form is not part of the "record of conviction," but is rather a postconviction report prepared internally by the prison, and so beyond the scope permitted in *Guerrero*.

The comments of the trial court in deciding whether the fact of the prior conviction could be used to impeach Rhoden are consistent with his analysis: "The statement in the Florida prior about having intercourse with a girl is not part of his conviction. It doesn't have anything to do with a conviction. It is only a statement evidently made to a probation officer—oh, yes, inmate's version of the offense. So it would be after the conviction is all over with." Inexplicably, the court later used this report as the basis for its finding the enhancement was proper.

"In sum, the trier of fact may consider facts established within the record of conviction, even if those facts were not essential to the judgment." (*People* v. *Smith* (1988) 206 Cal.App.3d 340, 344 [253 Cal.Rptr. 522], fn. omitted.) However, we can find no logical basis for concluding this report is part of the record of conviction.

We view the document as an intake and classification report used by the prison system for admininistration purposes. The record does not reveal any other use for it, save postconviction, and nothing suggests it was a factor in Rhoden's conviction or his sentencing.[23]

Removing this report from consideration, there are no remaining facts disclosing the substance of the offense actually committed. We must then "presume that the prior conviction was for the least offense punishable under the foreign law." (*People* v. *Guerrero, supra,* 44 Cal.3d at p. 352.)

decided and the hearing on the enhancement issue held after the *Guerrero* decision. Therefore, *Alfaro* was not the law at any pertinent point in these proceedings. At the time the offense was committed, the issue was not settled. "Where the law is unsettled, we do not believe a defendant can be said to have reasonably relied on a particular outcome." (*People* v. *Carr* (1988) 204 Cal.App.3d 774, 779 [251 Cal.Rptr. 458].)

[22] In the trial court the prosecutor argued: "I believe that this court is allowed to infer that if someone places his penis inside the vagina of a 13-year-old that this would constitute the requisite intent." Presumably the court agreed. In any event, this inference is not disputed by Rhoden.

[23] We express no views on documents prepared by prisons which assist the court in its sentencing or other determinations. (See, e.g., § 1203.03.)

Since that offense constitutes a misdemeanor in California, the imposition of the enhancement for the Florida prior was improper and must be stricken.

In light of the views expressed herein, the judgment of the lower court is affirmed. The abstract of judgment is ordered modified to reflect a total sentence of 12 years imprisonment with applicable credits. (§ 1260.) The petition for writ of habeas corpus is denied.

Crosby, Acting P. J., and Wallin, J., concurred.

A petition for a rehearing was denied January 5, 1990, and appellant's petition for review by the Supreme Court was denied April 4, 1990.