[No. D009532. Fourth Dist., Div. One. Oct. 2, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
KELLY LAFE GARNER, Defendant and Appellant.

COUNSEL

Paul A. Di Paolo, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Holly D. Wilkens and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KREMER, P. J.—Kelly Lafe Garner pleaded guilty to armed robbery (Pen. Code, §§ 211, 212.5, subd. (a), 12022.5) and assault with a firearm (Pen. Code, § 245, subd. (a)(2)) after the trial court denied his motion to dismiss for an alleged violation of the Interstate Agreement on Detainers Act (IAD) (Pen. Code, § 1389)[1]. On appeal, he contends the court erred in denying his motion. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In April 1986, the San Diego District Attorney (SDDA) filed a felony complaint, charging Garner with crimes committed in El Cajon. Garner left San Diego. Later in April, Salt Lake City, Utah authorities arrested Garner for crimes committed there. Before Garner could be tried in Utah, he escaped. He was next arrested by Nevada authorities on May 31, 1986, and charged with crimes committed in Las Vegas, Nevada.

On June 3, 1986, the San Diego County Marshal's Office, at the request of SDDA, sent a letter to the Las Vegas authorities explaining San Diego's interest in Garner.

Garner was convicted of the Nevada crimes and began serving a prison term in Nevada for those crimes in September 1986.

Garner testified he filled out a "Request for Disposition of Detainers" in mid-October 1986, and turned it over to a law clerk at the Nevada prison who was authorized to take and prepare requests from inmates for disposition of detainers. The law clerk represented he would turn over the request

---

[1] All statutory references are to articles within Penal Code section 1389 unless otherwise specified.

to the appropriate authorities. This form was apparently never received by the warden nor sent to San Diego.

On November 12, 1986, with the aid of another inmate, Garner prepared a motion demanding a speedy trial on the San Diego charges, or, alternatively a dismissal of the charges. Garner cited Penal Code section 1381 as authority for his speedy trial motion. The San Diego Superior Court received this motion and forwarded it to SDDA which received it on November 18, 1986.

Meanwhile, Nevada authorities contacted SDDA to inform them that if they still had an interest in Garner the SDDA should forward appropriate documentation to the Nevada prison where Garner was serving his sentence because the June 2, 1986, detainer had not followed Garner to the prison from the county jail. On November 24, 1986, SDDA sent a letter of detainer to the Nevada authorities along with IAD form III (certificate of inmate status) and IAD form IV (offer to deliver temporary custody).

On January 11, 1987, SDDA received from the Nevada prison authorities IAD forms III and IV plus an IAD form used by an inmate to initiate action on detainers, IAD form II (inmate's notice of place of imprisonment and request for disposition of indictments, informations or complaints). SDDA responded by sending Nevada officials IAD form VII, "Prosecutor's Acceptance of Temporary Custody," a form used when an inmate initiates action on a detainer.

On January 5, 1987, Garner went to Alabama for trial on criminal charges. He returned to Nevada on June 3, 1987. Three weeks later, on June 30, 1987, he went to Utah for trial and did not return to Nevada until December 29, 1987.

On January 15, 1988, SDDA contacted Nevada prison authorities to ascertain Garner's status. The Nevada authorities asked SDDA to resubmit form V. SDDA resubmitted form V on January 22, 1988.

In early January 1988, Garner refused to re-sign form II which would waive his extradition to California. He did not sign it until May 9, 1988, the date set for an extradition hearing. San Diego authorities took custody of Garner on July 25, 1988.

On August 30, 1988, an information was filed in San Diego charging Garner with five counts of armed robbery and an assault with a firearm. Garner moved to dismiss the charges because he had not been brought to trial within 180 days as required by article 3 of the IAD. Following denial

of his motion to dismiss, Garner pleaded guilty on October 24, 1988, to four counts of armed robbery and an assault with a firearm in exchange for dismissal of one armed robbery count. Garner was sentenced to six years.

DISCUSSION

I

*The Interstate Agreement on Detainers*

■ The IAD is codified in Penal Code section 1389. It provides a method of transferring a prisoner from one jurisdiction to another for disposition of pending charges. Under the IAD, once a state has lodged a detainer based on an uncharged indictment, information or complaint against a prisoner in another jurisdiction, the authorities must notify the prisoner of the detainer and give the prisoner an opportunity to request a final disposition of the pending charges. (Art. 3, subd. (c).) Then, either the prisoner or the prosecutor may initiate procedures leading to transfer and disposition of the charges. (Arts. 3, 4.)

The prisoner may initiate final disposition under article 3 by making a written request to the warden who must forward the request to the appropriate authorities in the other jurisdiction along with a certificate delineating the prisoner's sentence, the time already served and the time remaining to be served. (Art. 3, subds. (a), (b).) If the prisoner requests final disposition of the charges, he must be brought to trial within 180 days after the appropriate court and prosecutor have received formal notification. (Art. 3, subd. (a).) The 180-day period is tolled "as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter" or when the prosecutor obtains a continuance for good cause. (Arts. 6, subd. (a), 3, subd. (a).)

If the prosecutor initiates proceedings to obtain transfer of the prisoner under article 4, then the prisoner must be brought to trial within 120 days of his arrival in the receiving state. (Art. 4, subd. (c).) The time period may be extended "for good cause shown in open court." (Arts. 3, subd. (a), 4, subd. (c).) If the prisoner is not brought to trial within the time periods of the IAD, then he is entitled to have the charges dismissed. (Arts. 3, subd. (d), 4, subd. (e).)

The IAD states it is to be liberally construed to effectuate its purpose. (Art. 9.) The IAD's purpose is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or com-

plaints." (Art. 1.) Untried charges and detainers result in uncertainties which obstruct programs of prisoner treatment and rehabilitation. (Art. 1; *People* v. *Castoe* (1978) 86 Cal.App.3d 484, 487 [150 Cal.Rptr. 237].) As the court explained in *People* v. *Brooks* (1987) 189 Cal.App.3d 866, 872-873 [234 Cal.Rptr. 573]: "The origins of the IAD date back to 1948 when the Joint Committee on Detainers addressed administrative problems arising from the use of detainers. At that time prosecutors were not legally bound to act on detainers at any specific time. It was common practice to lodge a detainer and postpone extradition until completion of the prisoner's sentence in the foreign jurisdiction. Because little information about the underlying charge accompanied the detainer, prison officials did not know whether the detainer was based on an arrest warrant, complaint or 'the mere desire on the part of the filing authority to interrogate the inmate.' [Citation.] These practices created problems for the inmate and prison officials. '. . . [I]nmates with detainers lodged against them are invariably subject to a more restrictive prison environment. Such inmates are generally classified as maximum-security risks by prison authorities because of the detainee's purportedly increased propensity to escape as a result of the perceived possibility of further incarceration. Accordingly, access to various rehabilitation programs is markedly impaired, if not entirely precluded. Educational opportunities, vocational training, and recreational privileges are consequently curtailed; likewise, eligibility for furlough and parole programs is frequently denied. The existence of a detainer may also adversely affect sentencing procedures, undermining opportunities for sentence commutation, as well as vitiating an inmate's chances for concurrent sentencing should the detainer remain outstanding until his present sentence terminates. Furthermore, psychological disabilities are manifold: indeterminate future imprisonment, as well as anxiety and concern accompanying the more restrictive conditions of confinement, creates motivational problems which needlessly frustrate rehabilitation efforts.' [Citation.]" (Fn. omitted.)

By implementing a prisoner's right to a speedy trial, the IAD minimizes interference with such treatments and programs. (*People* v. *Cella* (1981) 114 Cal.App.3d 905, 920 [170 Cal.Rptr. 915].)

## II

### *June 2, 1986, "Letter of Detainer"*

■ The first issue is whether the June 2, 1986 "letter of detainer" sent to the Nevada authorities by the San Diego County Marshal's Office at SDDA's request was a "detainer" activating the IAD since "'a formal detainer must be filed before an inmate . . . may invoke the provisions of

the IAD.' [Citation.]" (*People* v. *Rhoden* (1989) 216 Cal.App.3d 1242, 1251 [265 Cal.Rptr. 355].)

The Supreme Court has stated " '[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " (*United States* v. *Mauro* (1978) 436 U.S. 340, 359 [56 L.Ed.2d 329, 346, 98 S.Ct. 1834].) This definition has been adopted in California. (*People* v. *Rhoden, supra*, 216 Cal.App.3d 1242, 1251; *People* v. *Cella, supra*, 114 Cal.App.3d 905, 917.) The definition has two basic components: (1) the notice must be filed with an institution in which a prisoner is serving a sentence and (2) it must advise the officials the prisoner is wanted to face pending criminal charges. The first requirement has been construed by this and other courts to mean the prisoner is serving a sentence following a conviction and is not a pretrial detainee. (See *Marshall* v. *Superior Court* (1986) 183 Cal.App.3d 662, 665 [228 Cal.Rptr. 364]; *People* v. *Zetsche* (1987) 188 Cal.App.3d 917, 924 [233 Cal.Rptr. 720].) The reason for this rule was explained in *People* v. *Zetsche, supra*, 188 Cal.App.3d 917, 924: "First, the Agreement seeks the 'orderly' disposition of outstanding charges. (Art. I.) Such would not necessarily be the case if the Agreement were applied to pretrial detainees. For example, in *United States* v. *Roberts, supra*, 548 F.2d 665, the prisoner was being held at a detention center because he was unable to make bail on pending charges. He argued that he was serving a term of imprisonment within the meaning of the Agreement. The court disagreed, stating that to extend the Agreement to pretrial detainees would be inconsistent with article III. [Citation.] The court reasoned if the Agreement applied to pretrial detainees, the prisoner could, under article III, 'wait until his trial was set in the jurisdiction where he was detained and then make a request which would require that he be transferred to another jurisdiction for trial, possibly disrupting the trial schedule of the first jurisdiction.' [Citation.]

"Secondly, the agreement was intended to cure the disadvantages of the detainer system inuring to sentenced prisoners who had entered the life of the institution to which they had been committed. (Art. I.) Because pretrial detainees are not ordinarily involved in institutional treatment or rehabilitative programs, the potential for abuse of the detainer system is not present. Since the nature of a detainee's continued confinement is uncertain and contingent upon the outcome of the trial and the imposition of sentence, 'a pretrial detainee [does not have] a sufficient interest in the rehabilitation programs of his confining institution to justify invocation of the [Agreement]. [Citations.]' (*People* v. *Reed, supra*, 620 F.2d at p. 711.)" (188 Cal.App.3d at p. 924.)

Here, the June 2, 1986, detainer notified Nevada authorities that San Diego wished to try Garner on offenses committed in San Diego but it was

filed at the county jail while Garner was a pretrial detainee awaiting trial on the Nevada charges. It was not filed with an institution in which Garner was "serving a sentence." Nor did this "detainer" follow Garner to the Nevada prison where he was sentenced following his conviction. Thus, the June 2 "detainer" could not have affected Garner's participation in any programs of treatment or rehabilitation, the purpose for which the IAD was enacted. The June 2, 1986, detainer did not activate the provisions of the IAD. Since the lodging of a formal detainer is a necessary prerequisite to activating the protection of the IAD and its deadlines, neither the October nor November requests were effective to trigger the 180-day limitation period of the IAD.

■ We also note neither the October 15 request nor the November speedy trial motion complied with the procedural requirements of the IAD. The IAD requires an inmate to make a request for final disposition of a detainer through the warden in order to invoke the protection of the IAD. (See art. 3, subd. (b).) The record here shows neither the October nor November request was presented to the warden. The October request lacked the warden's stamp and was not contained in Garner's central prison file, both of which would have occurred had the request been presented to the warden. The November motion for a speedy trial or for a dismissal was sent directly to the San Diego Superior Court and the SDDA. As the court explained in *People* v. *Rhoden, supra*, 216 Cal.App.3d 1242, 1252-1253:

"Rhoden's letter was sent directly to the district attorney, instead of the warden, and contained none of the information required in a certificate except the term of commitment. Without the accompanying certification from the warden, the district attorney had no duty to act upon the letter and no article III clock was activated. [Citation.] Compliance with this procedural requirement is the only way the People can be placed on notice they must bring the prisoner to trial within 180 days.

"Although a proper detainer was later lodged, Rhoden never complied with the requirement that he submit his request to the warden . . . .

"We are mindful of article IX, which states the agreement 'shall be liberally construed so as to effectuate its purposes.' However, we view those purposes to be the orderly and expeditious disposition of charges pending in foreign jurisdictions and the establishment of cooperative procedures to facilitate such disposition. [Citation.] Its purposes are not served by allowing substantial circumvention of those procedures." (Fn. omitted.)

Garner relies on *People* v. *Wilson* (1977) 69 Cal.App.3d 631 [138 Cal.Rptr. 259], to support his argument his October 15, 1986, request and November motion were sufficient to invoke the IAD. The *Wilson* court

stated: "The prisoner's sole obligation under the [IAD] is to advise the warden of his request for final disposition of the charges on which the detainer is based. [Citations.]" (*Id.* at pp. 636-637.) In *Wilson,* unlike here, the inmate made a request to the warden of the prison where he was incarcerated for final disposition of a California detainer. The issue in *Wilson* was whether the warden's delay in forwarding the inmate's request should be included in the 180-day period, not whether an inmate could trigger the IAD's 180-day period by sending a letter or motion directly to the prosecutor or court where charges were pending or by merely giving the request to a law clerk authorized by the prison.

In *People* v. *Rhoden, supra,* 216 Cal.App.3d 1242 and other cases, the courts have held a defendant must comply with the procedural requirements of the IAD in order to start its time periods running and to bring into play its dismissal sanctions. (See *Johnson* v. *Stagner* (9th Cir. 1986) 781 F.2d 758, 762 [filing of habeas petition was insufficient to trigger running of 180-day period]; *People* v. *Castoe, supra,* 86 Cal.App.3d 484, 490 [sending letters directly to officials in other state without going through warden was insufficient to trigger 180-day period of the IAD]; *People* v. *Quintana* (Colo. App. 1984) 682 P.2d 1226, 1229 [requesting disposition without the required documents or certificate was insufficient to trigger the IAD]; *Beebe* v. *State* (Del. 1975) 346 A.2d 169, 171 [sending letter requesting speedy trial directly to court in state where charges were pending was insufficient to trigger the 180-day period of the IAD]; *Shapiro* v. *Jones* (1985) 127 Misc.2d 935 [487 N.Y.S.2d 707], affd. 497 N.Y.S.2d 612 [mailing request directly to authorities in state where charges pending and without certificate of confinement status and before inmate began term of imprisonment was insufficient to trigger 180-day period of the IAD]; *Com.* v. *Lloyd* (1988) 370 Pa.Super. 65 [535 A.2d 1152, 1158-1159] [mailing request directly to authorities in other state without certificate of confinement and before prisoner entered term of imprisonment was insufficient to trigger the 180-day period of the IAD].)

No reversal is required on the ground SDDA failed to bring Garner to trial within 180 days of his October 1986 request for disposition or his November 1986 motion for a speedy trial.

### III

*January 1987 Request* ·

Garner contends his request for final disposition of the charges on January 14, 1987, triggered the running of the 180-day period of article 3.

The record shows Garner was in Alabama facing trial from January 5, 1987, to June 2, 1987. He was then in Nevada custody from June 3 to June 29, 1987 (a total of 26 days). On June 30, 1987, Garner was sent to Utah to face trial. He was returned to Nevada on December 29, 1987. On January 15, 1988, SDDA telephoned the Nevada authorities and were informed Garner had been returned to Nevada. Because a substantial amount of time had passed since Garner had signed the IAD forms for California, it was the policy of the Nevada authorities to have new IAD forms signed to insure the inmate was still willing to waive extradition. Garner refused to sign the IAD forms. An extradition hearing was scheduled for May 9, 1988. On that date, Garner signed a waiver of extradition. Garner pleaded guilty 168 days later, on October 24, 1988.

Garner argues the only time that was tolled during this period was the time he was actually in Alabama and Utah facing trials in those states. He contends the time between the two transfers (from June 3 when he was returned from Alabama to June 30, 1987, when he was sent to Utah) should be counted as part of the one hundred eighty-day period.

Garner is correct in his position that a prisoner is entitled to simultaneously request speedy dispositions in more than one jurisdiction and that the time limitations are tolled while the prisoner is facing trial in another jurisdiction because the prisoner is unavailable for transfer to another jurisdiction while on trial. (See *People* v. *Boggs* (1985) 166 Cal.App.3d 851 [212 Cal.Rptr. 683].) We also agree with Garner that the San Diego prosecutors had an affirmative duty to keep track of Garner's status.[2] (See *United States* v. *Mason* (N.D. Ohio 1973) 372 F.Supp. 651, 653.) However, we disagree with Garner's conclusion that because SDDA did not contact the Nevada authorities and did not attempt to obtain custody of Garner in June 1987 that those days between June 3 and 30 should be counted as part of the 180 days. During this period, Garner was not available to SDDA because he was scheduled to go to Utah, not California, to stand trial.[3]

██  Garner contends the 180-day period was not tolled by his refusal to sign new IAD forms and to waive extradition.[4] He points to cases assertedly

[2] Under this reasoning, for example, the 180-period continued to run between December 29, 1987, when Garner was returned to Nevada and January 15, 1988, when SDDA contacted the Nevada officials to learn of Garner's status.

[3] Garner contends no other time than the period he was actually in Alabama and Utah should be tolled because SDDA neither requested nor received any continuance. This contention is without merit. Under the IAD, time is not only tolled when the prosecutor obtains a continuance but also when the inmate is unavailable for trial. (Art. 6, subd. (a).)

[4] Garner in his brief, asserts he refused to sign the IAD forms sometime in March or April 1988 and cites to his trial brief in support. At the hearing, however, Garner testified he was asked to sign new IAD forms soon after his return from Utah. A Nevada prison official tes-

holding a request for a final disposition of a detainer results in an irrevocable waiver of extradition. (See *Franks* v. *Johnson* (E.D. Mich. 1975) 401 F.Supp. 669; *Housewright* v. *Lefrak* (1983) 99 Nev. 684 [669 P.2d 711].) Those cases merely point out that when an inmate makes an article 3 request for final disposition, he necessarily, by the terms of the statute, waives extradition. They do not address the issue presented here, i.e., the effect of allowing an inmate to withdraw his waiver of extradition.

The general rule is that the dismissal sanctions of the IAD will not be applied if the delay was caused by the prisoner: " '[a prisoner] cannot by his own action manufacture a violation of the [IAD] and then seek relief under it.' " (*United States* v. *Boggs* (5th Cir. 1980) 612 F.2d 991, 993.) More specifically, there are cases holding an inmate's refusal to waive extradition tolls the 180-day period. (See *People* v. *Uplinger* (1977) 69 Ill.2d 181 [370 N.E.2d 1054, 1058]; *Com.* v. *Stange* (1981) 286 Pa.Super. 38 [428 A.2d 226].)

Here, the Nevada authorities allowed Garner to either reaffirm his request for disposition of the San Diego detainer or to withdraw his request and waiver of extradition. Garner chose not to reaffirm his request and to withdraw his waiver of extradition. By refusing to reaffirm his waiver, Garner then made himself unavailable for transfer to San Diego. Garner, not California or Nevada officials, caused the delay. Under these circumstances, the 180-day period was tolled until Garner consented to extradition and again sought final disposition of the San Diego charges. When this period from January to May 1988 is excluded, then the record shows Garner was brought to trial within 180 days. The court properly denied Garner's motion for dismissal.

## DISPOSITION

The judgment is affirmed.

Work, J., and Todd, J., concurred.

---

tified Garner refused to sign in early January 1988. Another witness testified Garner had refused to sign the new IAD forms by the time SDDA contacted the Nevada prison authorities on January 15, 1988.