ALFONSO RICO WINDHAM, Appellant, v. THE
STATE OF NEVADA, Respondent.

No. 36920

April 10, 2002

43 P.3d 993

M. *Jerome Wright,* Reno, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Gary H. Hatlestad,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

*Per Curiam:*

On August 23, 2000, Alfonso Rico Windham pleaded guilty in the Second Judicial District Court, Washoe County, Nevada, to one count of resisting a public officer with the use of a deadly weapon. His plea came approximately four years after this crime had occurred. Windham was serving a term of imprisonment in the California State Prison on other felony charges while the Nevada charges were pending. Pursuant to the Interstate Agreement on Detainers ("Agreement"), Windham demanded disposition of the Washoe County charges. Windham appeals his conviction, claiming, among other things, that he substantially complied with the Agreement's requirements, that the prosecutor failed to bring him to trial within 180 days as required by the Agreement, and that his Sixth Amendment right to a speedy trial was violated. We conclude that none of Windham's assignments of error warrant relief, and we affirm the judgment of conviction.

### FACTS

On August 18, 1996, Windham was involved in a shootout in Reno, Nevada. Windham was apprehended by police officers and transported to the Reno police department for questioning.

Although he was subsequently released, on August 27, 1996, the State issued a criminal complaint and arrest warrant for Windham. After being released, Windham immediately left Reno and went to California. In California, Windham was arrested on other felony charges, convicted, and sentenced to a term of imprisonment in the California State Prison.

Prior to July 14, 1998, Washoe County lodged a detainer with the California State Prison, pursuant to the Agreement, to place a "hold" on Windham so that Washoe County could prosecute him.

On November 4, 1999, Windham submitted the documents that he contends constitute a valid demand for disposition under the Agreement ("first packet"). The packet was sent to "Washoe County Superior [sic] Court." The packet contained several different documents that appear to have been completed by Windham himself. Aside from the signature of a custodial representative as a witness, no other employee of the California State Prison appears to have participated in completing the forms. In response to the first packet, the Washoe County District Attorney sent Windham a letter. The letter stated that Windham needed to contact the California prison authorities and complete the proper paperwork. Once Washoe County received the proper paperwork, it would bring Windham to trial on the Washoe County charges.

In complying with the district attorney's request, Windham sent another packet of documents to the Washoe County District Attorney ("second packet") on March 2, 2000. This packet contained additional documents that were not included in the first packet, and the documents appear to have been completed by California prison officials. However, one form was incomplete, and as a result, Windham sent a third packet on March 14, 2000, which contained the same titled documents as in the second packet but with all of the forms properly completed. On July 8, 2000, Windham was transported from California and placed in the Washoe County jail to await trial on the Nevada charges.

On July 19, 2000, Windham filed a motion to dismiss the Nevada charges claiming, among other things, that the Agreement and his right to a speedy trial had been violated. The district court denied Windham's motion to dismiss. Windham entered a guilty plea on August 23, 2000, but reserved the right to appeal from the district court's denial of his motion to dismiss on all grounds.

## DISCUSSION

*Interstate Agreement on Detainers*

Resolution of this issue involves interpreting provisions of the

Agreement, a question of law that we review de novo.[1] In construing statutes, we first look to the plain language of the statute.[2] However, if the statutory language is ambiguous or fails to address the issue before us, we will construe it according to that which " 'reason and public policy would indicate the legislature intended.' "[3]

The Agreement is codified at NRS 178.620. Article I of the Agreement outlines the basic policy for the Agreement: to allow for the efficient disposition of outstanding charges against prisoners in order to facilitate more effective rehabilitation.

Article III(a) of the Agreement requires prosecutors in the requesting state to bring all pending charges, upon which detainers have been filed, to trial within 180 days from the prisoner's request for final disposition. Under Article V(c), the requesting state's failure to comply with the 180-day provision will result in dismissal of the charges, unless the trial court grants a continuance for "good cause."

Article III(a) describes the documents that a prisoner must file in order to take advantage of the 180-day provision:

> [H]e *shall have caused to be delivered to the prosecuting officer and the appropriate court* of the prosecuting officer's jurisdiction *written notice of the place of his imprisonment* and his request for a final disposition to be made of the indictment, information or complaint . . . . The request of the prisoner *shall be accompanied by a certificate of the appropriate official having custody of the prisoner,* stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.[4]

Additionally, Article III(b) sets forth the delivery procedures for the documents required in Article III(a):

> The written notice and request for final disposition referred to in paragraph (a) hereof *shall be given or sent by the prisoner to the warden, commissioner of corrections or other official having custody of him,* who *shall* promptly forward it together with the certificate to the appropriate pros-

[1]*SIIS v. United Exposition Services Co.,* 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

[2]*Salas v. Allstate Rent-A-Car, Inc.,* 116 Nev. 1165, 1168, 14 P.3d 511, 513-14 (2000).

[3]*Id.* at 1168, 14 P.3d at 514 (quoting *State, Dep't of Mtr. Vehicles v. Lovett,* 110 Nev. 473, 477, 874 P.2d 1247, 1249-50 (1994)).

[4]Emphases added.

ecuting official and court by registered or certified mail, return receipt requested.[5]

Further, Article III(d) specifies that the notification sent by the official having custody of the prisoner to the jurisdictions which have filed detainers must be "accompanied by copies of the prisoner's written notice, request, and the certificate."

Thus, according to sections (a), (b) and (d) of Article III, the Agreement contemplates a prisoner giving his request for final disposition to an officer of the prison in which he is confined—not sending the request himself. The officer then has the obligation to forward the request, with the appropriate certificate, to the prosecuting officials of the state that lodged the detainer.

Windham argues that the first packet constituted an effective invocation of his right to a trial under the Agreement because he substantially complied with the Agreement. He argues further that the purpose and spirit of the Agreement supports his argument that substantial compliance is sufficient to trigger the protections of the Agreement.

This case presents an issue of first impression in Nevada: To what degree must a prisoner comply with the procedural requirements of the Agreement in order to receive the protections of the Agreement? Courts in other jurisdictions have addressed this issue and are split on whether strict or substantial compliance with the procedural requirements of the Agreement is necessary to trigger the 180-day dispositional period.

Many courts have adopted a strict compliance standard for determining whether a prisoner has properly invoked his rights under the Agreement.[6] Under a strict compliance standard, prisoners invoking their rights under the Agreement must deliver to the warden or custodial official a written notice and request for final disposition as provided by Article III(b). The warden or custodial official then forwards the prisoner's request for a final disposition and a certification containing information regarding the prisoner's incarceration, as stated in Article III(a), to the appropriate court and the prosecuting officer in the state that issued the detainer. When strict compliance is required, prisoners cannot trigger the 180-day disposition period by personally communicating with the officials in the state that issued the detainer, because the documents must go through the warden or custodial official to ensure that the necessary information in Article III(a) is certified

---

[5]Emphases added.

[6]*See, e.g., U.S. v. Dent,* 149 F.3d 180, 185-86 (3d Cir. 1998); *Johnson v. Stagner,* 781 F.2d 758, 760 n.3 (9th Cir. 1986); *People v. Lavin,* 106 Cal. Rptr. 2d 40, 45 (Ct. App. 2001); *People v. Garner,* 274 Cal. Rptr. 298, 301-02 (Ct. App. 1990); *Johnson v. People,* 939 P.2d 817, 819-20 (Colo. 1997); *State v. Greenwood,* 665 N.E.2d 579, 581 (Ind. 1996); *Eckard v. Com.,* 460 S.E.2d 242, 247 (Va. Ct. App. 1995).

and sent by the appropriate custodial official. These cases are based on the rationale that strict compliance with the Agreement provides an effective system to rapidly adjudicate the claims of prisoners challenging extradition.[7] Indeed, under a strict compliance standard, prosecutors will know precisely when the Agreement has been invoked, without the burden of analyzing with a fine-tooth comb every correspondence from a prisoner.[8]

On the other hand, other courts require only substantial compliance with the procedural requirements of the Agreement before a prisoner is deemed to have validly activated his rights under the Agreement. Some of these courts allow a prisoner to trigger the 180-day provision himself by sending the notice to the officials of the state that issued a detainer without notifying the officials in the state where he is housed, as required by the Agreement.[9] These courts have noted, however, that once the prisoner himself decides to give notice to the state that issued the detainer, the notice he sends must strictly comply with the Agreement.

For instance, the Alabama Court of Criminal Appeals requires only substantial compliance: "It has generally been held that strict compliance with the agreement is not required, but rather 'a good faith, diligent effort by a prisoner to invoke the statute' by giving 'written notice to the official having custody of him.' "[10] The court qualified this, however: "once an inmate bypasses the statutory procedure, the burden is on the prisoner to demonstrate strict compliance with the notification and certification requirements of Sections (a) and (b) of art. III."[11]

It is unnecessary to decide whether a prisoner must strictly or substantially comply with the Agreement's procedural requirements because we conclude that under either standard Windham's first packet, which he sent himself, was insufficient to trigger the protections of the Agreement. Specifically, the first packet sent to

---

[7]*See Norton v. Parke,* 892 F.2d 476, 481 (6th Cir. 1989); *Stagner,* 781 F.2d at 760 n.3.

[8]*See Johnson,* 939 P.2d at 821.

[9]*See McCallum v. State,* 407 So. 2d 865, 869 (Ala. Crim. App. 1981); *Palmer v. Williams,* 897 P.2d 1111, 1115 (N.M. 1995); *see also State v. Burrus,* 729 P.2d 926 (Ariz. Ct. App. 1986) (holding that prisoner's letter requesting final disposition sent to the state that issued the detainer was effective for purposes of the Agreement where the letter (1) requested relief under the Agreement; (2) stated his place of imprisonment; (3) stated his term of commitment; (4) stated the amount of time already served; (5) stated the time remaining; and (6) stated his parole eligibility).

[10]*McCallum,* 407 So. 2d at 869 (quoting *People v. Daily,* 360 N.E.2d 1131, 1137 (Ill. App. Ct. 1977)).

[11]*Id.; accord Phillips v. State,* 695 S.W.2d 388, 390 (Ark. Ct. App. 1985); *Palmer,* 897 P.2d at 1115.

"Washoe County Superior [sic] Court" failed to apprise the Washoe County authorities of the time already served, the time remaining to be served, the amount of good time credits earned, the time of parole eligibility, and any decision of the state parole agency relating to Windham.[12] However, we conclude that Windham fully complied with the Agreement, under either standard, on March 2, 2000, when Windham sent his second packet. In his second packet, he sent written notice to the warden that he was requesting final disposition of the Nevada charges, and thus, invoking the Agreement's provisions.

*Speedy trial*

Windham contends that the delay of over four years from the time he was charged was in violation of his right to a speedy trial under the Sixth Amendment to the United States Constitution. In particular, Windham asserts that a four-year delay is presumptively prejudicial and, therefore, he need not demonstrate how the delay prejudiced him.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."[13] The United States Supreme Court has established that the right to a speedy trial is a fundamental right, which is imposed upon the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[14] Accordingly, the Supreme Court in *Barker v. Wingo*[15] established a four-part balancing test a court must conduct in order to determine whether the defendant's Sixth Amendment right to a speedy trial has been violated. The court should consider the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."[16]

We conclude that Windham's right to a speedy trial was not violated, because the majority of the delay can be attributed to Windham. After being released by Reno police, Windham immediately fled to California, and thereafter he was arrested on new felony charges, convicted, and sentenced to serve a term of imprisonment in the California State Prison. In addition,

---

[12]*See* NRS 178.620, Article III(a).

[13]U.S. Const. amend. VI.

[14]*See Barker v. Wingo,* 407 U.S. 514, 515 (1972).

[15]*Id.* at 530.

[16]*Id.; accord Doggett v. United States,* 505 U.S. 647, 651-52 (1992) (confirming the four-part balancing test); *see also Leonard v. State,* 117 Nev. 53, 83, 17 P.3d 397, 416 (2001) (applying the *Barker* factors).

Windham's first packet did not comply with the Agreement, creating further delay.

We have considered Windham's other claimed constitutional errors and conclude that they are without merit.

## CONCLUSION

We conclude that Windham's assignments of error do not warrant relief. Accordingly, we affirm the judgment of conviction.